[639 NYS2d 315]

In the Matter of Rocco VIGNOLA, an Attorney, Respondent.
DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST
JUDICIAL DEPARTMENT, Petitioner.

First Department, March 5, 1996

### APPEARANCES OF COUNSEL

*Sarah Jo Hamilton* of counsel *(Hal R. Lieberman,* attorney), for petitioner.

*Rocco Vignola,* respondent *pro se.*

### OPINION OF THE COURT

Per Curiam.

Respondent Rocco Vignola was admitted to the practice of law in the State of New York by the First Judicial Department on February 22, 1971.

On or about August 27, 1993, respondent was served with a notice and statement of charges alleging that he had engaged in serious professional misconduct.

A hearing was held before a Hearing Panel at which the following facts were adduced and conclusions reached.

In or about 1984, respondent entered into an arrangement with an acquaintance, a neighborhood licensed real estate broker, Ralph A. DiLillo, who had been operating for some period of time as a mortgage broker in his own mortgage brokerage business, under the name Loral Real Estate.

DiLillo would obtain funds from private persons (the investors) and arrange mortgage loans to real estate brokers, speculators and ordinary property owners. The mortgages were at high rates of interest, often 16%, and for short terms, usually six months to one year.

Respondent agreed at DiLillo's request to represent investors at closing, performing such tasks as preparing mortgage closing documents, attending closings and reviewing title searches.

It was DiLillo's practice to commence paying interest to the investors from the time he received the investors' money, regardless of whether or not a mortgage was placed immediately and he would continue to pay interest until the money was withdrawn by the lender.

Some time prior to May 1988, DiLillo opened a bank account at Anchor Savings Bank in the name of Loral Real Estate. Funds of investors were to be deposited into this account pending the actual loan and mortgage transactions. Respondent testified that DiLillo requested that respondent become a signatory on this account, so that, in the event he was unavailable on a mortgage transaction, respondent would have the power to sign checks and the closing could go forward. Respondent perceived his role as providing an accommodation to DiLillo and the investors and did not believe he had any authority to independently draw funds from or otherwise use the account.

In 1988, an accountant in the neighborhood, Robert Van Zandt, Sr., recommended DiLillo's mortgage investments to his own clients. DiLillo asked the Van Zandt investors to sign contracts between themselves and Loral Real Estate. The form contract provided, *inter alia*, that the investor will be represented by Fiore & Vignola, and that "[c]hecks for mortgage investment funds are to be made payable to ROCCO VIGNOLA, as Attorney". The contract did not specify any duties which respondent was to perform.

Respondent did not draft the form contract for DiLillo. However, he was shown a copy of it by DiLillo after it was prepared. Despite the direction in the contract concerning respondent's receipt of investors' funds, respondent did not have written escrow agreements with any of the investors and

was given no direction or instruction regarding his fiduciary responsibility.

The parties agreed in a stipulation: (a) that investors' checks Exhibits 7b and 37d (each for $10,000) and Exhibit 31c (for $8,000) were not placed on a mortgage; (b) that it is unknown whether Exhibits 13b and 13c (for $10,000 and $8,000, respectively) were placed on a mortgage; (c) that all other investors' checks enumerated in Exhibits 6 through 48 were placed on mortgages; (d) that if Ralph DiLillo were called to testify he would state that respondent was not a party to the fraudulent taking of investors' money; and (e) that if Robert Van Zandt, Sr. were called to testify he would invoke his Fifth Amendment privilege to all testimony concerning DiLillo investments.

Except for copies of investors' checks set forth above, the record is devoid of evidence concerning the Loral Real Estate account. The exact title and nature of the account is unknown, no statements, deposit slips or signature cards were obtained by either party and respondent's relationship to the account, other than as a signatory, is unknown. Respondent testified that he never represented to anyone that it was an escrow account.

Most of the investors had never met respondent before signing the form contracts and did not speak to him either before or after making their investments. Respondent attended closings on mortgages when notified by DiLillo to do so. He testified that he attended those closings as the attorney for the investors.

The parties agreed that due to the government investigation, the evidence presented to the Panel concerning investors' checks was incomplete. However, the parties further agreed that respondent endorsed 19 of the investors' checks totalling $562,000 and delivered them to DiLillo. He gave blanket permission to DiLillo to endorse respondent's name to any checks made out to the order of "Rocco Vignola, as Attorney" and to deposit those checks into the Loral Real Estate account.

The parties agreed that, based upon the available evidence, DiLillo endorsed or caused to be endorsed 36 checks totalling $832,000 and deposited the checks either into the Loral Real Estate account or into other business accounts.

Respondent neither inspected nor otherwise maintained records regarding the monies given to him by the investors or deposited in the Loral Real Estate account. Respondent did not deposit any of the aforementioned investors' checks, made pay-

able to the order of "Rocco Vignola, as Attorney," into an attorney escrow account.

On August 6, 1993, DiLillo was convicted of Federal crimes involving larceny of funds from his investors.

On November 7, 1988, respondent notarized the signatures of two investors, John Zuccaro and Lewis Cioffi, on a satisfaction of mortgage. Neither signatory personally appeared before respondent, and Zuccaro's signature was a forgery.

Respondent testified he believed the signatures were genuine. He recognized the signature of Lewis Cioffi from his own prior dealings with him and he relied upon DiLillo's representation regarding the authenticity of Zuccaro's signature. Respondent admitted that he made no effort to contact either of the signatories to verify their signatures.

Both Zuccaro and his wife testified that they had been unaware for two years (1988 to 1990) that their money had been placed on a mortgage, although they had received high interest payments during the period, or that their mortgage had been satisfied. It was their testimony that they never recovered their share of the proceeds from the mortgage which had been satisfied.

Respondent testified that it is not his usual practice to notarize a signature without the party signing appearing before him at the time of notarization.

On May 10, 1994, the Hearing Panel announced on the record that based upon the evidence presented they were sustaining all three charges of misconduct. The Panel then heard evidence in mitigation, which consisted of character evidence as to respondent's honesty, reliability and loyalty. Respondent also stressed his previously unblemished record in over 24 years of practicing law and his lack of venal intent.

On January 19, 1995, the Hearing Panel issued its written report recommending that respondent be publicly censured.

By petition dated April 4, 1995, the Departmental Disciplinary Committee is now seeking an order confirming the Hearing Panel's report and imposing the recommended sanction of public censure.

Charge I alleged that by endorsing investors' checks and allowing them to be deposited into a nonattorney escrow account, respondent commingled client funds in violation of Code of Professional Responsibility DR 9-102 (A) and 22 NYCRR 603.15 (b).

Respondent was charged under The Lawyer's Code of Professional Responsibility and related Court Rules in effect during

the years 1984 through 1989. DR 9-102 (A) and 22 NYCRR 603.15 (b), as they existed at that time, provided in pertinent part as follows:

**"DR 9-102. Preserving Identity of Funds and Property of a Client.**

"A. All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows".

**" 603.15. Fiduciary Responsibility; Maintenance of Bank Accounts; Recordkeeping; Examination of Records * * ***

"(b) *Separate Accounts.* Every attorney subject to this Court's rules, who is in possession of funds belonging to another person incident to the attorney's practice of law, shall maintain in a bank or trust company within the State of New York in the attorney's own name, or in the name of a firm of attorney[s] by whom he or she is employed, a special account or accounts, separate from any business or personal accounts of the attorney or attorney's firm and separate from any accounts which the attorney may maintain as executor, guardian, trustee or receiver, or in any such other fiduciary capacity, into which special account or accounts all funds held in escrow or otherwise entrusted to the attorney or firm shall be deposited.

"Other than accounts maintained by an attorney as executor, guardian, trustee or receiver, or in any other such fiduciary capacity, all special accounts as well as all deposit slips relating to and checks drawn upon such special accounts, shall be designated in a manner sufficient to distinguish them from all other bank accounts maintained by the attorney or the attorney's firm."

In the case at bar, it appears that respondent was acting as a conduit between DiLillo and the investors.

It was respondent's belief that the investors neither wanted nor intended their funds to stay in an attorney escrow account paying a low rate of interest, but instead wanted respondent to transmit the checks to DiLillo as soon as possible, so that the high interest payments could commence. This fact was confirmed by the investors who testified at the hearing.

At the hearing, staff counsel provided nothing to support the proposition that the designation "as attorney" on a check dictates that such a check must be put into an attorney escrow

account. Staff counsel also conceded that it was not their position that an attorney cannot be on an account with a client that is not an escrow account.

While the Hearing Panel concluded that it was unclear whether respondent had an actual "fiduciary" relationship with the investor clients, it nevertheless concluded that the investors' funds were funds of a client and they were deposited into an identifiable account maintained in New York State, into which no funds of respondent or law firm were deposited. Thus, it appears that there was no violation of DR 9-102 (A).

As set forth above, 22 NYCRR 603.15 (b) requires that client funds be maintained in a separate identifiable account but also supports the proposition that not all funds entrusted to an attorney must be held in an "escrow" account. Thus, it does not appear that respondent violated this Court Rule either.

The Hearing Panel reached the conclusion that once an attorney is required to maintain client funds in a separate account pursuant to section 603.15 (b), he is then also required to maintain records concerning the account as required by section 603.15 (c), and that respondent's failure to keep those records constituted a violation of section 603.15 (b) and DR 9-102 (A).

However, respondent was not charged with violating section 603.15 (c), the recordkeeping provision of the Court Rule. We do not agree that respondent's failure to keep records also constitutes a violation of section 603.15 (b) and DR 9-102 (A) since, as concluded above, respondent did hold the investors' funds in a separate account, albeit an account which was not in respondent's name, but in the name of Loral Real Estate. It does not appear that respondent acted against the investors' wishes when he deposited their funds in the Loral Real Estate account since it was their intent that the funds be transferred to DiLillo so that they would begin receiving high interest payments.

Charge II alleged that by allowing the investment broker to endorse investors' checks in respondent's name and allowing him to deposit those checks directly into the broker's business account, respondent engaged in conduct which adversely reflects on his fitness to practice law in violation of DR 1-102 (A) (6) (now [8]). The evidence does not support this charge. While the relationship among respondent, DiLillo and the investors is not entirely clear, we find that respondent was a conduit between DiLillo and the investors and simply passed funds from the investors to DiLillo as was intended by the

investors so they would begin receiving interest payments. Although the checks were made payable to respondent as attorney, their destination was the Loral Real Estate account of which respondent was a signatory but over which DiLillo also had control. Thus, by allowing DiLillo to endorse investors' checks made payable to him as attorney, respondent was merely allowing DiLillo, the person into whose account the funds were to be deposited, to endorse his name. The funds were intended to be delivered to DiLillo in any event, and no control of the funds was relinquished to him, which he was not to be given anyway. Respondent may have allowed DiLillo to take advantage of him, since DiLillo apparently was not using all of the investors' funds as intended. However, no investor sued respondent as a result of DiLillo's transactions and no government agency interviewed him in connection with the DiLillo investigation which resulted in criminal charges being brought against DiLillo for larceny.

Charge III alleged that respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of DR 1-102 (A) (4), by notarizing the signatures of persons who had not appeared before him. Respondent admitted this charge but denied that he had any knowledge that in one instance he was notarizing a false signature.

While respondent denied knowledge that one of the signatures was false, that signature of Zuccaro which respondent notarized appeared on a satisfaction of mortgage and Mr. Zuccaro testified he never recovered his share of the proceeds from that mortgage. Although we dismiss Charges I and II and confirm the Hearing Panel report only as to Charge III, under the extraordinary facts presented herein, we believe that the imposition of a public censure is justified *(see, Matter of Robbins,* 169 AD2d 6; *Matter of Glavin,* 153 AD2d 982; *Matter of Rochlin,* 93 AD2d 683).

Accordingly, the Disciplinary Committee's petition to confirm the Hearing Panel's report is granted only to the extent of confirming the Hearing Panel's finding that respondent violated DR 1-102 (A) (4) (Charge III) and the report is otherwise disaffirmed, with Charges I and II dismissed, and respondent is publicly censured.

SULLIVAN, J. P., MILONAS, ELLERIN, NARDELLI and WILLIAMS, JJ., concur.

Petition granted only to the extent of confirming the Hearing Panel's finding the respondent violated Code of Professional Responsibility DR 1-102 (A) (4) (Charge III) and the report is otherwise disaffirmed, with Charges I and II dismissed, and respondent is publicly censured.